INHABITANTS OF RIPLEY *versus* INHABITANTS OF LEVANT.

To set off a part of one town and annex it to another, has the same effect in regard to the legal settlement of persons residing on the territory annexed, as to incorporate a new town.

The incorporation of a new town from parts of other towns, "with all the persons having a legal settlement therein," includes all who had acquired their settlements on the territory of which the new town is composed, although removed therefrom at the time of incorporation.

By R. S. of 1841, c. 32, a manifest distinction exists between the division of a town and the incorporation of a new town from parts of other towns, in regard to the rights of settlement of the inhabitants, under certain circumstances. The *division* fixes the settlement of persons, absent at the time, in that part in which was their last dwelling place. The *incorporation* places in the new town, the settlement of those who *actually dwelt and had their homes* within its limits at the time of incorporation.

A. had his settlement in the town of B., and removed therefrom after having resided for a few weeks in a portion of the town which was subsequently annexed to other territory and incorporated into a new town: — *Held*, that A. having acquired his settlement in that part which remained the town of B., and having had no dwelling place and home within the bounds of the new town when incorporated, his legal settlement was still in B.

AGREEMENT OF FACTS from *Nisi Prius.*

This was an action of ASSUMPSIT, to recover for supplies

Ripley *v.* Levant.

furnished Thomas Raymond and family, as paupers. The proper notice and reply, denying liability, were admitted, the only question being one of settlement; the defendants contending that the paupers' settlement was in Kenduskeag and not in defendant town.

The following facts were agreed:—The paupers' settlement, on and prior to April, 1837, was in Levant, they having lived in that town, in various places, more than five years. In the latter part of April, 1837, they removed from Levant to Ripley, where they have since remained. Soon after they fell into want, and were ever after supplied by the town of Levant, in said town of Ripley, until July, 1854, when defendants withdrew their support, and the town of Ripley then commenced supporting them and furnished them the supplies sued for.

On Feb. 20, 1852, the town of Kenduskeag was incorporated, composed of parts of the two towns of Levant and Glenburn, about equal amounts of territory having been taken from each of said towns.

Defendants allege that the last dwelling place of said paupers in Levant, was in that part of the town which was incorporated into Kenduskeag; and the plaintiffs deny that fact. It is agreed that either party may take such testimony touching that question as they may see fit, in depositions, which testimony shall constitute a part of this case, the same to be submitted to the Court for their decision, with authority to draw such conclusions therefrom as a jury would be authorized to do. It is admitted that, prior to Jan. 30, 1854, said Raymond and his wife had given a mortgage of the land on which they lived in Ripley, to secure certain notes given by them; that, by consent of said Raymond and wife, and at the request of the overseers of the poor of Levant, who claimed the right in behalf of the town of Levant to redeem said mortgage, the mortgagee on that day assigned said mortgage and notes to the town of Levant, and the overseers paid him the amount due on the same; that the amount due and

paid was about $75, and the mortgaged property was worth about $250.

The Court are to render such judgment on default or nonsuit as the law of the case may require. In case of default, defendants are to be heard in damages.

In accordance with the above agreement, evidence was introduced by both parties.

*D. D. Stewart*, for plaintiffs.

1. Raymond, while *in transitu* from Levant to Ripley, passed through that part of the town since incorporated into Kenduskeag, and remained there a short time; but his residence or stoppage there was merely *transitory and temporary*, and therefore not such a residence as the statute contemplates, upon which the defence is based. *Turner* v. *Buckfield*, 3 Greenl. 229; *Hampden* v. *Fairfield*, 3 Greenl. 436; *Smithfield* v. *Belgrade*, 19 Maine, 390.

2. The defendants claim that the incorporation of Kenduskeag, out of parts of Levant and Glenburn, was a *division* of Levant, within the meaning of the first clause of the fourth mode of gaining a settlement. This proposition, the plaintiffs deny, and assert, upon their part, that the case falls directly and unequivocally within the meaning of the second clause of the fourth mode. R. S., c. 32, § 1, mode 4. And that, as the pauper was not living within the territory at the time of the incorporation, and had not been for fifteen years, he acquired no settlement in Kenduskeag, but retains his settlement in Levant. *Windham* v. *Portland*, 4 Mass. 384.

What constitutes the division of a town, within the meaning of the statute?

The answer is given by Chief Justice MELLEN in these words:—"Such a division of a town as shall produce two or more towns, composed of the same territory which formed the original town." *Hallowell* v. *Bowdoinham*, 1 Greenl. 132.

The only qualification of this definition, is in *Livermore* v. *Phillips*, 35 Maine, 184; but that case is *sui generis*, and has no application to the question now under consideration. In

the closing sentences of that opinion, SHEPLEY, C. J., recognizes the difference between the *division* of a town and the *incorporation* of a new town.

Whether the annexation of territory to a town, is to be regarded as a division of the town from which it is taken, it is unnecessary to consider. The current of authorities sustains the position that it is not a division within the meaning of the statute. *Groton* v. *Shirley*, 7 Mass. 156; *Fitchburg* v. *Westminster*, 1 Pick. 144; *Hallowell* v. *Bowdoinham*, 1 Greenl. 129; *New Portland* v. *Rumford*, 13 Maine, 299; *New Portland* v. *New Vineyard*, 16 Maine, 69.

Whether the creation of a new town *wholly* out of the territory of *one* old incorporated town, is a *division* of such old town, within the meaning of the statute, may, and perhaps must, depend upon the peculiar language of the Act creating such new town. It *may* be a division within the first clause of the fourth mode, or it *may* be an incorporation of a new town within the meaning of the second clause of that mode. If the Act itself professes to *divide* the old town, and to create a new town out of the part set off, it would, perhaps, be considered as coming within the first clause. If it professed to *incorporate a new town*, out of a part of the old one, it might, and probable would, fall under the *second* clause. See laws of 1842, "*Act to divide*" Minot and incorporate Auburn; also laws of 1845, "*Act to divide*" Anson and incorporate North Anson; also laws of 1850, "Act to incorporate the town of Kennebec." *Winthrop* v. *Auburn*, 31 Maine, 465.

The Act of February 20, 1852, incorporating the town of Kenduskeag out of parts of Levant and Glenburn, does not purport to be a *division* of either of those towns. It professes simply to incorporate a *new town out of parts of two old towns.* It falls, therefore, directly and clearly within the *second* clause of the fourth mode; and persons not living upon the territory at the time of its incorporation, by the provisions of that clause, have no settlement in the new town. *Windham* v. *Portland*, 4 Mass. 384; *Harvard* v. *Boxborough*, 4 Met. 571.

Again. The language of the statute itself seems to be too

clear to require any judicial construction as to its meaning. It says:—"When any new town shall be incorporated, composed of a part of one or more old incorporated towns, every person legally settled in any town of which such new town is wholly or partly so composed, or who has begun to acquire a settlement therein, and *who shall actually dwell and have his home within the bounds of such new town at the time of its incorporation*, shall have the same rights in such new town in regard to settlement, whether incipient or absolute, as he would otherwise have had in the old town where he dwelt." Now the Act creating the town of Kenduskeag, purports, on its face, to incorporate the new town out of parts of two old incorporated towns, thus falling precisely and literally within the language of the statute just cited.

3. The argument, thus far, has been based upon the *general* pauper statutes, in order to meet the argument upon which the defence is grounded. The reasoning is believed to be strictly in accordance with the authorities; but it is supposed to be wholly unnecessary here, for this case must turn upon the *language of the Act itself* incorporating Kenduskeag. Sec. 1 of that Act, Laws of 1852, c. 485, is in these words: "All that part of Levant lying in the northeast part of said town and bounded as follows, &c.; also, all that part of the town of Glenburn included and lying in the following limits, &c., together with all the persons having a legal settlement therein, is hereby incorporated into a separate town by the name of Kenduskeag."

This Court have already given an exposition of the words "*legal* settlement," as used in this Act, and they hold the words to mean all persons *who have acquired their settlements* on the territory incorporated into the new town. *Belgrade* v. *Dearborn*, 21 Maine, 337. The same question is also decided in *Winthrop* v. *Auburn*, 31 Maine, 465, 468.

*A. W. Paine*, for defendants, cited the following authorities:—*Hallowell* v. *Saco*, 5 Greenl. 143; *Wayne* v. *Greene*, 21 Maine, 357; *Lexington* v. *Burlington*, 19 Pick. 426; *Livermore* v. *Phillips*, 35 Maine, 188; *Windham* v. *Portland*, 4

Mass. 388, 389; *Hallowell* v. *Bowdoinham*, 1 Greenl. 132; *Holden* v. *Brewer*, 38 Maine, 472.

*Rowe*, for plaintiffs, in reply.

TENNEY, C. J. — This action is to recover for supplies, fur- nished by the defendants, for the relief of Thomas Raymond and his family, in the year 1854. The question of settlement is the only one presented. The defendants deny the settlement in the town of Levant; but insist, that under the facts agreed, and the evidence in depositions submitted therewith, it is in the town of Kenduskeag, which was incorporated on Febru- ary 20, 1852, and composed of parts of Levant and Glenburn. Special laws of 1852, c. 485.

It is admitted, that prior to April, 1837, the paupers had a settlement in the town of Levant, having lived in that town in various places for more than five years. It is satisfactorily shown by the evidence, that this residence was in that part of the town which is now Levant. In the latter part of April, they removed from Levant to Ripley, where they have ever since remained. Soon after they went to Ripley, they fell into want, and were supplied by the town of Levant, in the town of Ripley, until July, 1854, when the defendants with- drew their support, and since that time supplies have been furnished by the plaintiffs.

The place where the paupers last lived, for a few weeks before their removal to the town of Ripley, in the beginning of the year 1837, was in that part of the town of Levant which was afterwards a part of the town of Kenduskeag. Whether they lived there as a residence, and as a home, in view of the statutes touching the settlement of paupers, was a question to be determined by the Court, from the evidence in the depositions submitted, in connection with the facts agreed.

In the act incorporating the town of Kenduskeag, after the boundaries mentioned therein, it is added, "with all the per- sons, having a legal settlement therein, is hereby incorporated into a separate town," &c. This language is similar in its

import, and very nearly identical in its terms, with that used in the "Act to set off certain lands in Dearborn and annex the same to Belgrade." Special laws of 1839, c. 553, § 1. And the setting off of a part of a town, and annexing the same to another, has the same effect, as the incorporation of a new town, so far as regards the legal settlement of the persons resident on the territory thus annexed. *Groton* v. *Shirley*, 7 Mass. 156; *Hallowell* v. *Bowdoinham*, 1 Greenl. 129.

The language referred to, in the act setting off a part of Dearborn and annexing it to Belgrade, has had a construction in the case of *Belgrade* v. *Dearborn*, 21 Maine, 334. It was held to include all who had acquired their settlements in territory annexed to the other towns, although removed therefrom, at the time of the annexation. The same principle has been applied in *West Gardiner* v. *Farmingdale*, 36 Maine, 252; and in *Yarmouth* v. *North Yarmouth*, 34 Maine, 411.

It becomes necesary, then, to determine in what town the paupers in question had a settlement, upon the incorporation of the town of Kenduskeag. Their settlement having been in Levant, before Kenduskeag was incorporated, and it being manifest that they had gained no other, excepting in Kenduskeag, it must continue in Levant, unless by the operation of the laws it was changed therefrom. If they had gone directly to Ripley, from their last residence in that part of Levant which now constitutes a part of that town, in 1837, their settlement would now be in Levant.

If we assume, what is denied by the plaintiffs, that they did reside, and have their home, in the portion of Levant which was embraced within the limits of the new town, in 1837, did that residence and home fix their settlement therein, on its incorporation? If this question is to be answered in the affirmative, it must be by virtue of the fourth mode of acquiring a settlement, in sect. 1, of chap. 32, of Revised Statutes of 1841. And herein a manifest distinction is made between the division of a town, and the formation of a new town, from two or more old incorporated towns. In the former, those having a legal settlement, but absent at the

time of the division, shall have their settlement in the part wherein their last dwelling place shall happen to fall, at the time of the division; in the latter, any person legally settled in any town, of which the new town is wholly or partly so composed, *and shall actually dwell, and have his home, within the bounds of such new town, at the time of the incorporation,* shall have the same rights in such new town, in relation to settlement, as he would otherwise have had in the old town where he dwelt.

These modes of gaining a settlement, provided in the Revised Statutes of 1841, are the re-enactment of those in the statutes of 1821, chap. 122, sect. 2; and the latter are the same as those found in the statutes of 1793, of Massachusetts, chap. 34, sect. 2. These provisions have been considered by the Court of Massachusetts, and by this Court, under all the statutes, and the distinction is maintained and affirmed. *Groton* v. *Shirley,* and *Hallowell* v. *Bowdoinham,* before cited; *Starks* v. *New Sharon,* 39 Maine, 368.

If the home of the paupers for a few weeks, in the early part of the year 1837, was in the part of Levant now Kenduskeag, (their settlement being in Levant, before any part was taken therefrom,) this fact was without effect upon their settlement. In order that the same fact could have produced any effect, fifteen years afterwards, upon their settlement, some statute provision is required. No statute, or any construction of a statute, has gone so far as to do this.

The paupers, in no view of the evidence, in relation to the question, whether they resided and had their home in the portion of Levant, now in the new town, in the winter and spring of 1837, or not, can fall within the provision touching the settlement of persons, in the latter part of the fourth mode, in chap. 32, sect. 1, Revised Statutes. They acquired their settlement in the whole town, by a residence of five years in the part remaining Levant; and when the new town was incorporated, they had not a dwelling place and home within the bounds thereof. Their original settlement in Levant has undergone no change. *Defendants defaulted.*

HATHAWAY, MAY and GOODENOW, J. J., concurred.

APPLETON, J., dissented, and gave the following opinion:—

The town of Kenduskeag, composed of part of Levant and part of Glenburn, was incorporated in 1852.

It is admitted, that Raymond, the pauper, had his legal settlement in Levant, and that before its division he had removed to Ripley, where he has ever since continued to reside.

It is first to be ascertained from the evidence, in what part of Levant was his "last dwelling place." As to this there is much conflicting testimony. Raymond and his wife concur in fixing it in that portion of the defendant town which now constitutes part of Kenduskeag. In a question of this description, reliance may reasonably be placed on the accuracy of their recollection. They would naturally recollect their outgoings and incomings, for to them they were matters of interest—to others of indifference. Their testimony receives corroboration from other witnesses. Upon a comparison of all the evidence, I regard it as satisfactorily established, that the "last dwelling place" of the pauper in Levant, was in that part of the town which subsequently, by incorporation, became a part of Kenduskeag.

The pauper having his "last dwelling place" in that part of Kenduskeag, which was severed from Levant, and being absent therefrom at the time of the incorporation of the new town, and having acquired no legal settlement since, it remains to ascertain whether such settlement was continued in Levant, or by the incorporation of Kenduskeag became fixed therein.

The settlement of the pauper depends upon the question, whether or not a "division" of Levant took place, when a part of its territory was, with a part of that of Glenburn, incorporated into the new town of Kenduskeag. That Levant was thereby shorn of its population, wealth and territory, is unquestioned. Was it thereby divided? Was its unity severed into parts? If so, does not such severance constitute "division?" If it does not, what does? And when is a town divided?

The rights of the parties depend upon the construction to

be given to the fourth mode of gaining a settlement, under R. S., c. 32, § 1, which is in these words:—"Upon the *division* of any town, any person having a legal settlement therein, but being absent at the time of such division, and not having gained a settlement elsewhere, shall have his legal settlement in that town wherein his *last dwelling place* shall happen to fall, upon such division.  When any new town shall be incorporated, composed of a *part of one or more old incorporated towns,* every person legally settled in any town of which such *new* town is *wholly* or *partly* so composed, or who has begun to acquire a settlement therein, and who *shall actually dwell and have his home within the bounds of such new town* at the time of its *incorporation,* shall have the same rights in such new town in relation to settlement, whether incipient or absolute, as he would otherwise have had in the old town where he dwelt."

It is as obvious as it can be made to appear by the force of language, that "division" and "incorporation" are indissolubly connected together as part of one and the same transaction.

Towns are not divided by one act, and the parts thus obtained incorporated by another.  Whenever a new town is formed from a "part of one or more old incorporated towns," there must necessarily be a division as well as incorporation. The severance by which the part or parts are obtained constitutes a division.  The incorporation of the new town from the parts thus obtained, includes the idea of a division, without which there would be no parts to be incorporated.

If, "upon the division of any town," a new town "should be incorporated composed of a part of one" old incorporated town, this would be regarded as a division.  It would be a division and incorporation together.  If a new town should be "incorporated composed of a part of one or more old incorporated towns," it is difficult to perceive how the parts of old incorporated towns, thus fused by a new incorporation, can have been severed from the old towns, except by division. The parts of old towns formed into a new one, are not annexed, for there is no existent corporation to which they are added by annexation.

It was held in *Barnstead* v. *Alton*, 32 N. H., 245, upon a careful examination of all the authorities, that a town was divided, whenever any portion of it was separated from the rest, whether the severed portion was incorporated in a new town or annexed to an old one.

The fourth mode in its very terms is but one mode. It embraces those absent from the parts of the town divided and those resident in the new town incorporated. It thus makes provisions for all contingencies which may arise. It imposes upon each part of the town the burthen of those, who, having a settlement, may be absent at the division, as well as those who may be residents at the incorporation. The liabilities of the old and new town are to be determined upon the same principles. The last dwelling place of the individual absent, and the actual residence of the individual dwelling and having his home, govern and control.

On any other construction, every town, a part of which may have been incorporated with a part of some other into a new town, will be compelled to bear the burthen of those, who, having a settlement, may be absent from its remaining territory as well as those absent from the part incorporated in the new town. In other words, the town would lose its territory and wealth, and retain all the paupers, who, being absent, would have acquired a settlement upon its lost territory. This would be manifestly unjust.

It has been settled by a series of decisions that the annexation of a part of one town to another, is not to be regarded as a division of the former town, within the meaning of the fourth mode of gaining a settlement, to which reference has been had. To this extent the authorities go and no further. *Hallowell* v. *Bowdoinham*, 1 Greenl. 129; *New Portland* v. *Rumford*, 13 Maine, 299; *New Portland* v. *New Vineyard*, 16 Maine, 371.

The incorporation of a *new* town from a "part of one or more old incorporated towns," is not a case of annexation, nor is it to be regarded as such. When parts of two old incorporated towns are formed into a *new* corporation, the old towns are divided within the meaning of the statute. Levant

having been divided, the legal consequences of a division must follow. *Lexington* v. *Burlington*, 19 Pick. 426.

The parts of Levant and Glenburn, "together with all the persons having a legal settlement therein," are incorporated in the new town. In reference to similar language, WHITMAN, C. J., in *Belgrade* v. *Dearborn*, 21 Maine, 337, uses the following language:—"The meaning of the words might, perhaps, be satisfied by restricting them to such persons as had a legal settlement in Dearborn, and were, at the time of the annexation, resident on the parts annexed. But it must be regarded as more consonant to the intention of the Legislature, indicated by prior enactments, *in pari materia*, to suppose they intended to include here, by the words used, all who had acquired their settlement in the territory annexed to the other towns, although removed therefrom at the time of annexation. And moreover it is provided in the Act concerning paupers, that upon the division of towns, those having a legal settlement therein, and who were absent therefrom at the time of such division, shall have their settlements in such town as the part they dwelt upon shall have fallen into." According to principles upon which the decision in Belgrade *v.* Dearborn rests, the town of Levant cannot be held to support the pauper Raymond.

In *Livermore* v. *Phillips*, 35 Maine, 184, SHEPLEY, C. J., says, "it is doubtful whether the definition of the phrase used in the statute, 'upon the division of any town,' intimated in the case of Hallowell *v.* Bowdoinham, will prove to be entirely satisfactory." In Hallowell *v.* Bowdoinham, it was held that a division must produce two or more towns composed of the original territory. But the effect of an incorporation of a *new* town "composed of a part of one or more old incorporated towns," was not before the Court in that, nor in the other cases which determined the effect of annexation.

The construction here given must be regarded as the determination of a question now first argued and presented distinctly for consideration.

It is insisted, that the clause in the Act incorporating Ken-

duskeag, Stat. 1852, c. 485, § 5, which provides that it "shall not be holden for any liabilities of said town of Levant," exempts the former from the support of the pauper and imposes the burden upon the latter. But such is not its meaning. The section in which these words are found, relates to the funds and personal property of the towns, and to other debts and liabilities. It contains no allusion to the subject of settlement, or to the future support of paupers. Though Raymond was then a pauper, he might not so continue. The language refers equally to present debts and personal liabilities; not to debts which at some future time might be contracted, or to liabilities which might thereafter arise. It imposed upon Levant its then existing debts and liabilities. The claim sought to be recovered, was not a liability then existing, nor one that it could be foreknown would ever exist. It was neither within the letter nor the spirit of the Act.

The settlement of the pauper not being in Levant, the action is not, in my opinion, maintainable.

MAY, J., gave the following explanation of his views and the reasons for his concurrence in the opinion of the Court:

The defendants having admitted that the settlement of the paupers was once in their town, must show that it has been changed; the burden is on them.

If the language of the Act of incorporation, which declares that certain described parts of the territory of Levant and Glenburn, "together with all the persons having a legal settlement, is hereby incorporated into a separate town by the name of Kenduskeag," overrides the provisions of the R. S., c. 32, § 1, in regard to the fourth mode of gaining settlements, so as to fix upon the town of Kenduskeag the settlement of such persons only as had actually gained their settlements upon the territory embraced in such town, whether they had their homes upon the territory at the time of the passage of such Act or not; then, as the facts contained in the report do not show that these paupers gained their settlement upon such territory as was included in the new town, the defendants have failed to make out a defence.

If similar language in the Act incorporating the town of West Gardiner, was held to determine whose settlements were transferred to the new town, and whose remained in the city of Gardiner, no reason is perceived why it should not have the same effect here.

Such language may properly be regarded as changing the provision of the Revised Statutes, so far as it is inconsistent with the provisions thereof; and it would seem to be clearly inconsistent with that provision, which makes the settlement of the pauper depend either upon an actual home, or absence of the pauper, at the time of the passage of the Act; by substituting instead of these provisions, a provision that all settlements should be determined by the *place* where they were actually gained, and fixing them in the territory where they had been thus acquired.

If this is not so, then the question arises, where, upon the facts in this case, was the settlement of these paupers ? in Levant or Kenduskeag ?

I think the testimony satisfactorily shows that their last dwelling place was in that part now Kenduskeag. Their testimony is direct, and somewhat corroborated. On the other hand, there is testimony to impeach them, and some tending to show that their residence in Kenduskeag was merely temporary. But considering the character of the paupers, and that it was not necessary that they should have a right to occupy the house they were in, in order to have a domicil there, and then that much of the testimony as to their intentions is only of an impeaching character, and so is not affirmative proof, I think the weight of evidence is in favor of the position that their last dwelling place was in Kenduskeag.

If so, and the Act of incorporation is not to be regarded as a division, then the settlement of the paupers would still remain in Levant, they having removed before the passage of the Act. I think this is not a case of division but of incorporation.

If I did not regard this question as settled by the authorities — if it were a new question — I certainly should concur

with Judge APPLETON in his construction of the statute; but for the reasons given by SHEPLEY, C. J., in *Starks* v. *New Sharon*, I think the Court are bound to regard *stare decisis* as a sound maxim for their guidance in this case.